UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
IN RE:

      SHERRY LYNN BROWN            CASE NO. 06-30199

                     Debtor         Chapter 7

--------------------------------------------------------
IN RE:

      MICHAEL GLOSS               CASE NO. 06-30872

                     Debtor         Chapter 13

--------------------------------------------------------
APPEARANCES:

THE CROSSMORE LAW OFFICE       EDWARD Y. CROSSMORE, ESQ.
Attorneys for CFCU Community Credit Union   Of Counsel
ll5 West Green Street
Ithaca, New York 14850

LAW OFFICE OF PETER D. GRUBEA      STEVEN DOLSON, ESQ.
Attorneys for Debtor Michael Gloss
482 Delaware Avenue
Buffalo, NY 14202

JEFFERY H. COLEMAN, ESQ.
Attorney for Debtor Sherry Brown
107 S. Albany St.
Ithaca, NY 14850

ANDREW D. BING, ESQ.
Deputy Solicitor General
Office of the Attorney General
The Capitol
Albany, New York 12224

LYNN HARPER-WILSON, ESQ.
Staff Attorney for Chapter 13 Trustee
250 South Clinton Street, Suite 203
Syracuse, New York 13202

2

Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge

## MEMORANDUM-DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

Under consideration by the Court are objections to exemptions claimed by the debtors, filed by Edward Y. Crossmore, Esq. ("Crossmore") on behalf of CFCU Community Credit Union (the "Credit Union"), in the chapter 7 case of Sherry Lynn Brown ("Brown") and the chapter 13 case of Michael Gloss ("Gloss") (collectively, the "Debtors"). The objection in the Brown case was filed on December 14, 2006 and scheduled to be heard in Syracuse, New York on January 9, 2007. The Credit Union's objection in the Gloss case was filed on December 6, 2006 and scheduled to be heard in Binghamton, New York on February 13, 2007. The Debtors filed responses to the objections of the Credit Union on December 18, 2006 and January 16, 2007, respectively. In the interim, on December 27, 2006, Gloss filed a motion to avoid a judgment lien held by the Credit Union. The Credit Union filed opposition to that motion on January 10, 2007.

A hearing on the Credit Union's objection in the Brown chapter 7 case was held in Syracuse, New York on January 9, 2007 and adjourned to February 6, 2007. The hearing on the Credit Union's objection to Gloss's claim of exemptions in his chapter 13 case, as well as the hearing on Gloss's motion seeking to avoid the Credit Union's lien, was held in Binghamton, New York on February 13, 2007. The Court adjourned both to its Binghamton chapter 13 calendar on March 13, 2007, despite the fact that Brown's case was a chapter 7 filing. At that hearing, the Court heard oral argument by Crossmore, as well as by the attorneys representing the individual Debtors. The Court indicated that it would allow the parties an opportunity to provide

3

additional memoranda of law.  The motions were originally submitted for decision on April 16,

2007.[1]  This date was ultimately extended to July 5, 2007, by virtue of a letter from the Court,

dated June 25, 2007.[2]

## JURISDICTIONAL STATEMENT

---

[1]   Because the objections involve a determination of similar issues, the Court has consolidated the two cases for purposes of hearing and decision.

[2]   At the hearing on January 9, 2007, the Court raised the issue of notice to the New York State Attorney General because of the Credit Union's constitutional challenge to certain state statutes, as will be addressed herein.  Winthrop Thurlow, Esq., then an Assistant Attorney General ("Thurlow"), was present in Court that day on another matter.  The Court requested Crossmore to provide Thurlow with notice of the motion in the Brown case in order that New York State might have an opportunity to intervene.  According to the docket in the case, Crossmore sent a letter, as well as a copy of the motion, on January 26, 2007, to Thurlow.  A similar mailing was sent by Crossmore in the Gloss case on or about January 27, 2007 (Docket No. 14 and 31, respectively).  Crossmore also provided Thurlow with a copy of his memorandum in support of the Credit Union's objections on or about March 9, 2007 in both cases (Docket No. 25 and Docket No. 36, respectively).

At the hearing on March 13, 2007, the Court indicated that it would notify Thurlow of the submission date for any response on behalf of New York State.  On May 4, 2007, the Court, having been informed that Thurlow was no longer with the Syracuse office of the New York Attorney General, sent a letter pursuant to 28 U.S.C. § 2403 to Ed Thompson, Assistant Attorney General at the Syracuse office, certifying that the Court was considering an issue involving the constitutionality of the New York Debtor and Creditor Law ("D&CL") §§ 282 and 283 and extending the date for the submission of memoranda of law to May 25, 2007, on notice to all parties.  On May 16, 2007, the Court was contacted by an Assistant Solicitor General of the New York State Office of the Attorney General ( the "State"), who indicated that her office would make a determination on whether the State wished to intervene in the two cases.  By letter, dated May 24, 2007, the State requested an extension for the submission of any memoranda of law in the Brown Case, as well as the Gloss case.  *See* Docket Nos. 30 and 40, respectively.  There being no objection by any of the parties, on June 5, 2007, the Court granted the State's request extending the deadline to June 22, 2007, in both cases.  *See* Docket Nos 31 and 43, respectively. Pursuant to a request from Crossmore, the Court agreed on June 25, 2007, to a further extension to July 5, 2007, for the submission of any memoranda replying to that filed on behalf the State on June 22, 2007.  *See* Docket Nos. 34 and 47, respectively.

4

The Court has core jurisdiction over the parties and subject matter of these contested matters pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1), (b)(2)(A), (B) and (O).

### **FACTS**

**Brown Chapter 7 Case**

Brown filed a voluntary petition ("Brown Petition") pursuant to chapter 7 of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101-1330 ("Code") on October 20, 2006. Brown listed the Credit Union as holding an unsecured claim in the amount of $8,503, which she indicates arose in October 2002 and which she describes as "credit." *See* Schedule F, attached to Brown Petition. According to Crossmore's affidavit, sworn to on December 16, 2006 in support of the Credit Union's objection ("Crossmore Affidavit") (Brown Docket No. 9), the Credit Union obtained a judgment on May 22, 2006, which was allegedly filed in the Tompkins County Clerk's Office on June 14, 2006, in the amount of $9,699.26. Brown indicated in her Statement of Financial Affairs that the Credit Union had garnished her wages, effective June 15, 2006. Brown claims a number of exemptions, including $40 in cash, $712 in checking and savings accounts and a tax refund of $1,500 pursuant to D&CL § 283. *See* Schedule C, attached to Brown Petition. The Credit Union objects to Brown's claim of exemption, totaling $2,252, comprised of the cash, checking and savings accounts and tax refund. It is the Credit Union's position that the exemption is a bankruptcy-specific exemption which is otherwise unavailable to judgment debtors in civil enforcement proceedings in New York State. The Credit Union makes the argument that "New York's allowance of said exemption exclusively to debtors in a bankruptcy case violates the

5

geographical uniformity requirement of Article 1, Section 8, Clause 4 of the U.S. Constitution."
Crossmore Affidavit at ¶12.  The Credit Union also takes the position that New York's enactment
of bankruptcy-specific exemptions violates the Supremacy Clause.  The Credit Union contends
that when the Constitution was enacted, the states ceded to the federal government the power to
enact bankruptcy legislation and that such power was reserved to Congress exclusively.

According to the Debtor, state legislation does not violate the Supremacy Clause as long
as it does not contradict the provisions of the Bankruptcy Code, citing to *Perez v. Campbell*, 402
U.S. 637 (1971).  As for the Uniformity Clause, a/k/a Bankruptcy Clause, the Debtor points out
that its limitations impact Congress, not state legislatures.  Furthermore, pursuant to Code §
522(b), Congress specifically authorized the states to update their exemption laws, which it found
to be "'outmoded and . . . hopelessly inadequate.'"  *In re Vasko*, 6 B.R. 317, 321 (Bankr. N.D.
Ohio 1980), quoting H.Rep. No. 95-595, 95th Cong.; 1st Sess. 126-127 (1977), U.S.Code Cong.
& Ad.News  1978, p. 6087.

**Gloss Chapter 13 Case**

Gloss filed a voluntary petition ("Gloss Petition") pursuant to chapter 13 of the Code on
October 18, 2006.  According to Gloss's schedules, Option One Mortgage holds a first mortgage
on the real property located at 72 South Street, Dryden, New York (the "Residence").  *See*
Schedule D, filed by Gloss on October 30, 2006.  There is also a second mortgage held by Robert
and Shirley Geddes in the amount of $15,000.  *Id.*  Gloss lists the Credit Union as holding a claim
in the amount of $14,665.01 based on a judgment entered April 3, 2002.  *See* Schedule F, filed
on October 30, 2006.  Gloss originally estimated the value of the Residence to be $79,800 based

on tax assessment information.  *See* Schedule A, filed on October 30, 2006.  However, on March 5, 2007, Gloss's counsel acknowledged that there were actually two separate tax parcels used by Gloss as a single homestead and that based on the assessed value of both parcels at a 90% equalization rate, the market value of the Residence was actually $88,666.67.

On October 26, 2006, a proof of claim was filed in the Gloss case on behalf of Option One Mortgage in the amount of $57,617.28.  The Credit Union filed a proof of claim on November 22, 2006, in the amount of $16,261.80.  The bar date for filing proofs of claim was March 13, 2007.  According to the claims register in the case, Robert and Shirley Geddes did not file a timely proof of claim.

Gloss claims a number of exemptions, including $2,400 pursuant to D&CL § 282(1) with respect to a 1998 Chevrolet Monte Carlo, which he valued at $2,950.  He also claims a $50,000 homestead exemption in the Residence pursuant to § 5206(a) of the New York Civil Practice Law and Rules ("CPLR").

The Credit Union objects to Gloss's claim of a $50,000 homestead exemption based on the fact that it obtained its judgment against Gloss on April 3, 2002, well prior to the 2005 amendment to CPLR § 5206, which increased the homestead exemption for New York State residents from $10,000 to $50,000, effective August 30, 2005.  It is the Credit Union's position that the amendment was not intended to apply to judgment liens in existence prior to August 30, 2005.  *See* Crossmore Affidavit (Gloss Docket No. 18), sworn to December 5, 2006, at ¶ 6.  In addition, the Credit Union contends that applying the exemption to its judgment lien also impairs the contract between it and Gloss in violation of Article 1, Section 10 of the U.S. Constitution. Furthermore, the Credit Union argues that it violates the Taking Clause of the Fifth Amendment.

The Credit Union further objects to Gloss's claim of an exemption in a motor vehicle pursuant to D&CL § 282 on the same constitutional grounds as its objection in the Brown case. The Credit Union argues that the statute is unconstitutional based on the Supremacy Clause and the Bankruptcy Clause of the U.S. Constitution, relying extensively on the cases of *In re Wallace*, 347 B.R. 626 (Bankr. W.D. Mich. 2006) and *In re Cross,* 255 B.R. 25 (Bankr. N.D. Ind. 2000). The Credit Union takes the position that Congress could not and did not re-delegate to the states the power to create bankruptcy-specific exemptions in enacting Code § 522(b)(2)(A).[3]

Gloss contends that New York State, in enacting D&CL § 282, has not made an effort to create its own bankruptcy process. He argues that state-created exemptions can only be used by a debtor in a *federal* bankruptcy case and not in state proceedings involving a judgment debtor.

New York State's Attorney General (the "State") takes the position that D&CL § 282-283 are constitutional. The State argues that Code § 522(b)(2), now § 522(b)(3), grants the states significant latitude with which to adopt their own exemption schemes. According to the State, there is nothing in Code § 522(b) that precludes the states from creating exemption schemes that are specifically applicable to bankruptcy proceedings. The Credit Union responds that there is nothing in Code § 522(b) that expressly authorizes the states to enact bankruptcy-specific exemptions. Furthermore, it is the Credit Union's position that Congress is without authority to delegate what the Credit Union argues is the exclusive power to legislate bankruptcy laws. It is the Credit Union's position that while in opt-out, New York State prohibited its residents from

---

[3] Code § 522(b)(2) was in effect at the time that the New York legislature elected to "opt-out" of the Federal exemptions set forth in Code § 522(d). With the enactment of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), which was signed into law on April 20, 2005, and made applicable to cases filed after October 16, 2005, the new section is now found at Code § 522(b)(3).

8

selecting the exemptions set forth in Code § 522(d), the State's residents were then limited to

those exemptions available to other non-bankruptcy judgment debtors as set forth exclusively in

Article 52 of the CPLR, specifically CPLR §§ 5205-5206.

## DISCUSSION

> If there is one doctrine more deeply rooted than any other in the process of
> constitutional adjudication, it is that we ought not to pass on questions of
> constitutionality . . . unless such adjudication in unavoidable.

*In re Basch*, 341 B.R. 615, 622 (Bankr. W.D. Mich. 2006), quoting *Spector Motor Service v.*

*McLaughlin* 323 U.S. 101, 104 (1944).  In *Basch* the court ultimately suggested that the debtor

amend his schedules to claim non-bankruptcy specific exemptions, thus relieving the court of

having to examine the constitutionality issue concerning a bankruptcy-specific exemption found

in a Michigan statute, enacted in 2004 (Mich. Comp. Laws § 600.5451(o)) concerning property

held as a tenancy by the entirety.  Unfortunately, it does not appear that the Debtors in the cases

before this Court have such an option.  Therefore, this Court must consider whether in electing

to opt out of the federal exemptions, Code § 522(b) properly authorized the New York State

legislature to create a set of bankruptcy-specific exemptions for its residents.[4]

_____

[4]    Of approximately thirty-five states that have elected to opt out of the Federal
exemptions, at least five enacted bankruptcy-specific exemptions, including Georgia, Iowa, New
York, Ohio and West Virginia.  *See, generally,* Joseph Lamport, *The Preemption of Bankruptcy-
Only Exemptions*, 6 CARDOZO L. REV. 583, 584 n.20 and 599-600 (1985).  Both Arkansas and
Kentucky had enacted similar exemptions (*id.)*; however, both of those states later repealed the

9

Code § 522 governs exemptions in bankruptcy cases.  Whether DC&L §§ 282 and 283 are constitutional requires the Court to begin its analysis with an examination of the legislative history of Code § 522.  Section 6 of the Bankruptcy Act of 1898 stated that, "[t]his Act shall not affect the allowance to bankrupts of the exemptions which are prescribed by the laws of the United States or by the State laws in force at the time of the filing of the petition in the State wherein they have had there [sic] domicile for the six months immediately proceeding the filing of the petition . . . ."  11 U.S.C. §24.  Thus, a debtor's home state was the exclusive source of exemptions at that time.  Indeed, this was recognized by the Supreme Court in *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181 (1902).  In that case, the Supreme Court sustained the power of Congress to recognize state exemptions in bankruptcy without it being an unlawful delegation of its legislative power.  *Id.* at 190.  The court also concluded that "the system is, in the constitutional sense, uniform throughout the United States, when the trustee takes in each state whatever would have been available to the creditor if the bankruptcy law had not been passed. The general operation of the law is uniform although it may result in certain particulars differently in different states."  *Id.*

Some thirty-two years later, the Supreme Court acknowledged that "[o]ne of the primary purposes of the Bankruptcy Act is to 'relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities

---

legislation opting out of the Federal exemptions in 1991 and 2005, respectively.  *See* 14 COLLIER ON BANKRUPTCY at AL-1 and KY-1, respectively (15th ed. 2006).  Michigan is not one of the states that elected to opt out of the Federal exemptions.  Nonetheless, on January 3, 2005, Michigan adopted a bankruptcy-specific exemption statute providing that a debtor in bankruptcy could exempt from property of the estate "real property, held jointly by a husband and wife as a tenancy by the entirety, except that this exemption does not apply with regard to a claim based on a joint debt of the husband and wife."  Mich. Comp. Laws § 600.545191)(o).

consequent upon business misfortunes.'" *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)

(quoting *Williams v. U.S. Fidelity & Guaranty Co.,* 236 U.S. 549, 554 (1915)).  "A fundamental

component of an individual debtor's fresh start in bankruptcy is the debtor's ability to set aside

certain property as exempt from the claims of creditors.  Exemption of property, together with the

discharge of claims, lets the debtor maintain an appropriate standard of living as he or she goes

forward after the bankruptcy case."  4 COLLIER ON BANKRUPTCY ¶ 522.01 (15th ed. 2006).

The exemption concept, as well as the concept of a "fresh start," have evolved over the

years.  The first Bankruptcy Act, passed in 1800 by Congress, was intended to benefit creditors.

*See Central Virginia Community College v. Katz*, 546 U.S. 356, 126 S.Ct. 990, 1002 (2006).  As

one commentator observed, it was the public interest that was originally served by exemptions

"because destitute persons were unlikely to pay taxes or produce wealth that could be taxed.  But

while the earliest purposes of debtors' exemptions may have been an economic one of keeping

people productive, by the early nineteenth century multiple objectives were reflected in the

provisions."  William J. Woodward, Jr., *Exemptions, Opting Out, and Bankruptcy Reform*, 43

OHIO ST. L.J. 335, 337 (1982).  One such objective was that of a debtor's fresh start, which

evolved as a central consideration in bankruptcy in the twentieth century.  *Id.* at 340.  As

Woodward observes,

> State exemptions, suitable for advancing the humanitarian goals of exemptions in
> and out of bankruptcy in 1898, had thus become potentially unsuited to advancing
> the fresh start goals of modern bankruptcy.  The perceived reasons behind
> exemptions in bankruptcy had changed while the provisions themselves, largely
> unchanged state exemptions designed to advance goals different from the
> bankruptcy fresh start, had not.  With the addition of a rising number of consumer
> bankruptcies, for which the fresh start was most important, the time was ripe for
> reform.

*Id.* at 341-42.

Congress apparently recognized the changing landscape and, in 1970, created the Commission on the Bankruptcy Laws of the United States. *See* Act of July 24, 1970, Pub. L. No. 91-354, § 1(a), 84 Stat. 468 (1970). The Commission was to "'study, analyze, evaluate and recommend changes' in the Bankruptcy Act 'in order for such Act to reflect and adequately meet the demands of present technical, financial, and commercial activities.'" *U.S. v. Kras*, 409 U.S. 434, 451 n.2 (1973), quoting Communication from the Executive Director, Commission on the Bankruptcy Laws of the United States Transmitting a Report of the Commission on the Bankruptcy Laws of the United States, July 1973, H.R. Doc. No. 137, Parts I, at 1, 93rd Cong., 1st Sess. (1973) (the "Commission Report"). Among other things, the Commission Report expressed concerns that the state law exemptions were hopelessly antiquated and nonuniform. *Id.* at pt. I, at 169. Ultimately, it found that "[t]he fresh start objective would be met, in part, by 'preservation of the debtor's property necessary in his household' by means of a uniform federal exemption which would 'set apart such property from that available generally to creditors' so that the debtor could retain 'essential goods.'" *In re Neiheisel*, 32 B.R. 146, 148 (Bankr. Utah 1983), quoting the Commission Report. In 1974 Congress also received a report from the National Conference of Bankruptcy Judges, which proposed that the federal exemptions serve as an alternative to state law exemptions. Ultimately,

> [t]he bill introduced in the Senate proposed allowing state law to govern exemptions as it had under the 1898 Act. *See* S.Rep.No.95-989, 95th Cong., 2d Sess. 6 (1978), reprinted in (1978) U.S.Code Cong. & Ad.News 5787, 5792. The House bill, by contrast, proposed allowing a bankrupt debtor to choose between state exemptions and enumerated federal exemptions. *See* H.R.Rep.No.95-595, 95th Cong., 1st Sess. 126-27 (1977), reprinted in (1978) U.S.Code Cong. & Ad.News 5963, 6087-88. The language of section 522(d) is parallel, for the most

part, to the provisions regarding exemptions in the House bill. The opt-out
provision, section 522(b)(1), for which there is virtually no legislative history, was
added to section 522 as a compromise provision. *See* 124 Cong.Rec. S17,412
(daily ed. Oct. 6, 1978).

*In re Sullivan*, 680 F.2d 1131, 1135-36 (7th Cir. 1982).

It is unfortunate that Congress, in agreeing to a last minute compromise which included

the opt-out clause of Code § 522(b)(1), failed to define the scope of the state power when opting

out.  *See In re Bartley*, 33 B.R. 768, 772 (Bankr. E.D.N.Y. 1983) (noting that "[t]he language of

the statute enunciates no guidelines binding upon the states in their creation of exemption

statutes").  So it was that the New York State legislature in 1982 interpreted the Bankruptcy

Reform Act of 1978, specifically Code § 522(b)(1), as authorizing each state to adopt its own set

of bankruptcy exemptions in the event that the state elected to "opt out" of the federal bankruptcy

exemptions of Code § 522(d).   *See* Executive Memorandum of Gov. Hugh L. Carey ("Carey

Memo"), approving L. 1982, ch. 540, 205th Leg., 1982 N.Y. Sess. Law 2609-2610 (McKinney).

According to the Carey Memo,

> [t]he bill reflects the Legislature's judgment that the present federal bankruptcy
> exemptions allow debtors to retain too great a portion of their assets, that the level
> of federal exemptions has contributed to the sharp rise in personal bankruptcy
> filings which have occurred since the federal law took effect, and that the bill will
> enable the debtor in bankruptcy to keep sufficient property to permit a fresh start
> following a filing in bankruptcy.

*Id.* at 2610.[5]  The question that arises is whether New York State's application of Code § 522(b)

---

[5]  DC&L 282-283 was enacted despite letters expressing concerns as to the legislation's
constitutionality.  *See* Letter addressed to the Governor's counsel and dated June 18, 1982, from
Professor Samuel J.M. Donnelly, Syracuse University College of Law, expressing concerns that
the proposed bill might violate the Uniformity/Bankruptcy Clause, and Letter addressed to the
Governor and dated June 18, 1982, expressing concerns that the legislation discriminates
"between the destitute consumers who use a federally granted remedy and those who do not."
Both letters are attached as exhibits to Crossmore's Memorandum of Law, filed on July 5, 2007,

violated either the Uniformity Clause, a/k/a the Bankruptcy Clause, of the U.S. Constitution or the Supremacy Clause.

## Bankruptcy Clause, Article I, section 8, cl. 4 of the U.S. Constitution

_____Under the Bankruptcy Clause, Congress was granted the power to "establish . . . uniform Laws on the subject of Bankruptcies." The Bankruptcy Clause contains no restriction on the states. *Cross,* 255 B.R. at 31. Indeed, the Supreme Court has acknowledged that "state laws are suspended only to the extent of actual conflict with the system provided by the Bankruptcy Act of Congress." *Butner v. United States*, 440 U.S. 48, 55 n.9 (1979 ), citing *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 4 L.Ed. 529 (1819).

The Court of Appeals for the Sixth Circuit recently commented that such uniformity, as required by the Constitution, would be "unattainable if states could pass their own laws." *In re Hood*, 319 F.3d 755, 764 (6th Cir. 2003), *aff'd and remanded,* 541 U.S. 440 (2004). The court in *Hood* recognized that while the original intent was to grant exclusive power to the federal government, eventually there was acceptance that in the absence of federal legislation, the states had concurrent power to pass laws on bankruptcy. *Id.*; *see also Rhodes v. Stewart,* 705 F.2d 159, 162 (6th Cir. 1983) (noting that "the state and federal legislatures share concurrent authority to promulgate bankruptcy laws") (both citing *Sturges*, 17 U.S. (4 Wheat.) 122; *Lausch*, 16 B.R. 162, 165 (M.D. Fla. 1981) (finding that Code § 522(b)(1) "is not an unconstitutional delegation of congressional legislative power but rather is merely a recognition of the concurrent legislative power of the state legislatures to enact laws governing bankruptcy exemptions").

─────────────────────

in both cases on behalf of the Credit Union.

The decision in *Sturges* was issued at a time when there was no federal bankruptcy law and, as indicated by Chief Justice Marshall,

> [t]the power granted to congress may be exercised or declined, as the wisdom of that body shall decide.  If in the opinion of congress, uniform laws concerning bankruptcies ought not to be established, it does not follow that partial laws may not exist, or that state legislation of the subject must cease.  It is not the mere existence of the power, but its exercise, which is incompatible with the exercise of the same power by the states.  It is not the right to establish uniform laws, but their actual establishment, which is inconsistent with the partial acts of the states.

*Sturges,* 17 U.S. (4 Wheat.) at 195-196.

Thus, it was that the Supreme Court in *Hanover National Bank,* 186 U.S. 181, recognized that exemptions governed by state law do not violate the Bankruptcy Clause.  As pointed out by the Court of Appeals for the Fifth Circuit, "a federal bankruptcy law which recognizes and enforces state laws, affecting exemptions and priorities of payment is a uniform law, even though the law may operate differently from state to state." *Nehme v. Immigration and Naturalization Serv.*, 252 F.3d 415, 428 (5th Cir. 2001), citing *Stellwagen v. Clum*, 245 U.S. 605, 613 (1918). The Supreme Court in *Stellwagen* held that

> [n]otwithstanding this requirement as to uniformity, the Bankruptcy Acts of Congress may recognize the laws of the state in certain particulars, although such recognition may lead to different results in different states.  For example, the Bankruptcy Act recognizes and enforces the laws of the state affecting dower, *exemptions*, the validity of mortgages, priorities of payment, and the like.

*Stellwagen,* 245 U.S. at 613 (emphasis supplied).

Various courts have considered the constitutionality of a state statute under the Bankruptcy Clause, including *In re Mata*, 115 B.R. 288, 291 (Bankr. D. Colo. 1990) (finding that a bankruptcy-specific exemption in an individual retirement account was unconstitutional, noting that "[i]t is not permissible for states to seek to enact two different levels of exemptions, one

15

applicable in bankruptcy and one without.  There is nothing in the Code or the legislative history underlying its adoption indicating that Congress intended to delegate such authority to the various states"); *In re Holt*, 84 B.R. 991, 1000 (Bankr. W.D. Ark. 1988), *aff'd*, 97 B.R. 997 (W.D.Ark. 1988), *aff'd*, 894 F.2d 1005 (8th Cir. 1990)(finding that bankruptcy-specific exemptions did not violate the Bankruptcy Clause and noting that a state was free to provide exemptions which were more or less restrictive than the federal exemptions.  The court declined to consider the Supremacy Clause, however, because the creditor had not made that argument.); *Vasko*, 6 B.R. 317 (addressing the constitutionality of bankruptcy-specific exemptions and finding that the state statute did not violate the Bankruptcy Clause) and, *In re Bloom*, 5 B.R. 451, 454 (Bankr. N.D.Ohio 1980) (addressing the constitutionality of bankruptcy-specific exemptions and determining that although the Ohio statute was not as liberal as the Code's exemptions in § 522(d), it did not violate the Bankruptcy Clause).

Given the fact that the requirement of uniformity found in the Bankruptcy Clause is actually a limitation placed on Congress and not on the states, in considering the constitutionality of New York's D&CL §§ 282-283, the Court deems it more appropriate to focus on the Supremacy Clause and the doctrine of preemption, whereby state laws concerning bankruptcy are invalid if they are inconsistent with federal bankruptcy statutes.  *See Perez,* 402 U.S. 637.  While the courts in *Holt* and *Bloom* found no conflict with the Bankruptcy Clause when a state chose to enact bankruptcy-specific legislation that provided exemptions that were more or less restrictive than those found at Code § 522(d), neither Court addressed whether the same state statutes were constitutional under the Supremacy Clause.  It is on this issue that the Court will focus the remainder of its discussion.

**Supremacy Clause, Article VI, cl. 2 of the U.S. Constitution**

The Supremacy Clause provides that "[t]his Constitution and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. According to the U.S. Supreme Court, "any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause." *Perez,* 402 U.S. at 652. Thus,

> [p]re-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, where there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress.

*Louisiana Public Serv. Com'n v. F.C.C.*, 476 U.S. 355, 368-69 (1986) (citations omitted). Whether or not a state statute conflicts with that of a federal statute requires "ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict." *Perez,* 402 U.S. at 644. The fact that the state legislature may have had a proper purpose in mind when it enacted the state statute, e.g., providing similar exemptions as those found in Code § 522(d), does not negate the possibility that the statute may frustrate the full effectiveness of federal law, thereby rendering the state statute invalid. *Id.* at 651-52.

In examining Code § 522(b), the court in *Rhodes* considered the Supremacy Clause and noted that

> Congress has not preempted an area wherein it has legislated when it expressly and concurrently authorizes the state legislatures to disregard or opt-out of such

federal legislative area.  In such instance, rather than preempting the area, Congress expressly authorizes the states to "preempt" the *federal* legislation. Congress did not intend to preempt bankruptcy exemptions through promulgation of 11 U.S.C. § 522(d) since it vested in the states the ultimate authority to determine their own bankruptcy exemptions.  11 U.S.C. § 522(b)(1).  Section 522(b)(1) encompasses no facial restrictions upon the states' authority to opt-out. The Fifth Circuit has recently adjudged that the states are empowered to create whatever exemptions they elect.

*Rhodes*, 705 F.2d at 163, citing *In re McManus*, 681 F.2d 353, 355-56 and 357 (5th Cir. 1982), as well as *In re Sullivan*, 680 F.2d 1131, 1137 (7th Cir. 1982).  The court in *Rhodes* quoted *McManus* for the view that it "'is inescapable that Congress must have realized that the states may enact different exemptions which would possibly conflict with Congress' own exemption policy as it was reflected in § 522(d).'"  *Rhodes*, 705 F.2d at 164, quoting *McManus*, 681 F.2d at 357, n.7; *see also In re Shumaker*, 124 B.R. 820, 825-26 (Bankr. D. Mont. 1991) (considering the Bankruptcy Clause and noting that the states have to power to enact their own bankruptcy exemption scheme as long as it does not conflict with federal bankruptcy legislation); *but see Cross,* 255 B.R. at 35 (concluding that "the states may not create exemptions that apply only to bankruptcy proceedings.  Doing so frustrates the full operation of federal law by changing the balance Congress struck which allocates the consequences of bankruptcy between debtors and creditors"); *Matter of Reynolds*, 24 B.R. 344, 347 (Bankr. S.D. Ohio 1982) (disagreeing with the courts' analysis in *Bloom* and *Vasko* and drawing a distinction between a general exemption scheme and one which applies only in a bankruptcy context).  The court in *Reynolds* argued that

[w]hen a state endeavors to adopt exemptions applicable only in the bankruptcy court, it then invades an area of law reserved to the federal government, as preempted by the United States Constitution and statutes enacted pursuant thereto. . . . They cannot, furthermore, adopt provisions peculiar to and applicable only under federal bankruptcy law.  To hold otherwise would permit an evasion or annulment of the federal bankruptcy laws indirectly that would not be

countenanced directly since the Congress did not delegate its bankruptcy powers, assuming such could be done.

*Id.*

This reasoning can be found in *Cross*, as well as *Wallace*, cited by Crossmore on behalf of the Credit Union.  The court in *Cross* was asked to address whether an Indiana statute was invalid on constitutional grounds.  The statute in question allowed a debtor in bankruptcy to exempt his/her interest in real property held as a tenant by the entireties unless a joint petition had been filed by the debtor and spouse or they had both filed individual petitions.  Analyzing the statute under the Supremacy Clause, the court in *Cross* concluded that "it specifically conflicts with the statutory framework Congress created for dealing with entireties property in bankruptcy proceedings involving only one spouse."  *Cross*, 255 B.R. at 32.  Pursuant to Code § 522(b)(2)(B), now found at Code § 522(b)(3)(B) under BAPCPA, Congress allowed a debtor to claim an exemption in any interest in property held by the debtor prior to the commencement of the bankruptcy case as a tenant by the entirety "to the extent that such interest . . . is exempt from process under applicable nonbankruptcy law."  11 U.S.C. § 522(b)(3)(B).  The court concluded that "[b]y preventing the bankruptcy trustee from administering property which the state is willing to allow creditors to reach outside of bankruptcy, Indiana has violated the Supremacy Clause and the exemption is invalid."  *Id.* at 36.

This Court agrees with the conclusion reached by the court in *Cross*.  However, this Court is not inclined to extend that conclusion to the matter presently under consideration.  The Indiana statute at issue in *Cross* conflicted with the Code as enacted in 1978.  Under the Bankruptcy Act of 1898, the bankruptcy estate was limited to property that a debtor was able to transfer and that

a creditor was able to proceed against in satisfying its claim.  Property held by tenants by the

entirety could not be transferred by an individual spouse and could not be used to satisfy the

individual spouse's debt.  *In re Hunter*, 125 B.R. 349, 353 (Bankr. N.D. Ind. 1990).  Thus, if only

one spouse filed bankruptcy, any property held as tenants by the entireties did not become part

of his/her estate.  *Id.*  The individual debtor was able to discharge his/her obligation to a joint

creditor, leaving the creditor unable to reach the entireties property to satisfy its claim either in

the bankruptcy or after the individual debtor's discharge.  *Id.*  As the court in *Hunter* noted,

"[t]his was, quite rightly, characterized as 'legal fraud.'" *Id.*

　　　　With the revision of the Code in 1978, the bankruptcy estate was broadly defined to

include "all legal or equitable interests of the debtor in property as of the commencement of the

case." 11 U.S.C. § 541(a)(1).  Thus, the bankruptcy estate included property a debtor was entitled

to exempt.  *Id.* at 355.  In the absence of an exemption, a trustee was able to sell the estate's

interest, as well as that of the nondebtor spouse, if certain conditions were met, as set forth in

Code § 363(h).  However, the trustee's ability to sell the property was subject to Code §

522(b)(2)(B), "which gives effect to the 'immunity' from execution that entireties property

traditionally enjoys as to the claims of an individual creditor of either spouse."  *Id.* at 357.

　　　　However, the Indiana legislature saw fit to go "beyond the traditional immunity from

execution recognized by common law and § 522(b)(2)(B) [now 522(b)((3)(B)]."  *Id.*  It allowed

a debtor to exempt "any interest" in entireties property, leaving the trustee without any ability to

sell both the estate's interest and that of the co-owner nondebtor spouse.  *Id.* at 358.  It was this

conflict which led the court in *Cross* to hold the statute invalid under the Supremacy Clause.

　　　　It is important to note that the "exemption" found in Code § 522(b)(2)(B) is in addition

20

to the exemptions allowed by Code § 522(d) and those allowed by state law.  In fact, the court in *Hunter* construed Code § 522(b)(2)(B) as actually not creating a separate exemption for "entireties  real estate" when it described it as giving effect to the traditional "immunity" from execution that property held as tenancy by the entireties have.  *Id.* at 357.

In this Court's opinion, this is an important distinction.  What this Court is being asked to consider is whether the exemptions provided in D&CL §§ 282-283 conflict with the exemptions provided by Congress in Code § 522(d).  This question was considered by the court in *Bartley*, 33 B.R. 768.  In that case, the court was asked to decide whether the exemption of "cash" pursuant to D&CL § 283(2) included shares of corporate stock claimed by the debtor.  The court analyzed the constitutionality of New York's statute and applied the two-step test enunciated in *Perez* in determining whether it frustrated the full implementation of federal law and was, therefore, invalid under the Supremacy Clause.  The court pointed out that the language of Code § 522(b), which grants the states the power to opt-out of the federal scheme of exemptions and to schedule their own exemptions, "enunciates no guidelines binding upon the states in their creation of exemptions statutes." *Id.* at 772.  Giving consideration to the decisions in *Rhodes*, *McManus* and *Sullivan,* the bankruptcy court concluded that "under the unambiguous language of § 522(b)(1), the states are free to develop their individual exemption schemes unencumbered by the standards enunciated in § 522(d)." *Id.* at 773.  Accordingly, the court in *Bartley* concluded that there was no conflict between D&CL § 282(2) and Code § 522(d)(5) and that the state statute was "not antagonistic to the letter of or policies underlying the Code and does not offend the supremacy clause." *Id.*

The view that the language of Code § 522(b) is unambiguous was also shared by the court

in *In re Goering*, 23 B.R. 1010 (Bankr. N.D. Ill. 1982), which indicated that the language

"implicitly indicates a state may exempt the same property in 522(d), more property than that

included in 522(d) or less property than that.   In fact states may also prescribe their own

requirements for exemptions which may either circumscribe or enlarge the list of exempt

property." *Id.* at 1013.   Admittedly, the court in *Goering*, was not concerned with a bankruptcy-

specific exemption when it analyzed the state's homestead exemption under the Supremacy

Clause.   Rather, it was an exemption available to all judgment debtors in Illinois.   The issue

before the court was whether the Illinois homestead exemption of $10,000, which applied to

"householder having a family," was in conflict with Code § 522(d) and, therefore,

unconstitutional under the Supremacy Clause.   At the time, Code § 522(d)(1) allowed for an

exemption of $7,500 in a residence and applied separately for each debtor in a joint case.[6]

Ultimately, the court concluded that the state statute was not invalid under the Supremacy Clause

because it did not "stand as an obstacle to the accomplishment and execution of the full purposes

and objectives of the Bankruptcy Code." *Id.* at 1015.

As acknowledged by one court, "the case law clearly reflects that the fresh start policy of

the Bankruptcy Code does not require those states that have opted out of the federal exemptions

to provide exemptions comparable, concomitant, or corresponding to the federal exemptions.

(citations omitted)." *Clark v. Chicago Mun. Emp. Credit Union ( In re Clark)*, 119 F.3d 540, 544

(7th Cir. 1997); *see also Neiheisel*, 32 B.R. at 168 (indicating "that states may set exemptions at

levels lower or higher than those fixed by Congress is federal policy").   The Commission Report

---

[6]  On January 1, 1982, Illinois amended its statute, allowing a $7,500 exemption for each
individual debtor.  *Goering*, 23 B.R. at 1011.

certainly expressed concerns that many state exemptions were outdated, and Code § 522(d) was intended to remedy those concerns.  It is also evident that states such as New York, in an effort to address those same fresh start policy concerns for its residents who sought bankruptcy relief, decided to enact bankruptcy-specific exemptions comparable to those found in Code § 522(d).

As pointed out by the court in *Vasko*, "[i]n order for a state law to conflict with a federal law it must frustrate the purpose of Congress.  The state law must in its effect, obstruct the basic objectives of the federal law."  *Vasko*, 6 B.R. at 323.  New York State has opted out of the exemptions available in Code § 522(d).  Therefore, its residents are limited to exemptions provided under state law.  In this case, Gloss claimed an exemption of $2,400 in his motor vehicle, as provided in D&CL § 282(1).  This is comparable to the federal exemption for a motor vehicle of $2,950.  *See* 11 U.S.C. § 522(d)(2).  Consistent with the Congressional policy of providing a debtor with a fresh start, both statutes allow a debtor an opportunity to retain a motor vehicle as a means of transportation.  At the same time, New York State apparently felt that creditors were entitled to some protection as well, at least to the extent of $550, the difference between the state and federal exemptions.  This difference, in the view of the Court, does not appear to "obstruct the basic objectives of the federal law."

The Credit Union has also objected to Brown's claim of an exemption in cash totaling $2,252 pursuant to D&CL § 283(2), which provides for a cap of $2,500 and is unavailable to a debtor that claims a homestead exemption pursuant to CPLR § 5206.  Code § 522(d)(5), sometimes referred to as the federal "wild card" exemption (*see In re Ring*, 138 Fed.Appx. 834, 836 (7th Cir. 2005); *In re Benson*, 363 B.R. 415, 417 (Bankr. W.D. Pa. 2007)), allows a debtor to exempt his/her "aggregate interest in *any property*, not to exceed $975 plus up to $9,250 of any

23

unused amount of the exemption provided under paragraph (1), namely a debtor's interest in real property or personal property used as a residence, which is limited to $18,450 in value. "Any property" includes monies held in a bank account. *See In re Calvin*, 329 B.R. 589, 597 (Bankr. S.D. Tex. 2005). Again, the Court concludes that the two provisions are not in conflict. Thus, the Court agrees with the conclusion of the court in *Bartley* that D&CL § 283(2) did not conflict with Code § 522(d)(5) and was not unconstitutional under the Supremacy Clause.

The Credit Union also relies on the decision in *In re Kanter*, 505 F.2d 228 (9th Cir. 1974) in which the court concluded that a California statute prohibiting an assignee by operation of law of a party to a personal injury action from acquiring any interest in any monies that might be recovered was unconstitutional under the Supremacy Clause. *Id.* at 231. The case was decided prior to the Bankruptcy Reform Act of 1978 and prior to the expanded definition of property of the estate pursuant to Code § 541(a)(1). The statute at issue was found not to be a general exemption provision. *Id.* at 230. However, the court recognized that the language referring to "an assignee by operation of law" was a term intended to apply to a trustee in bankruptcy, denying him/her from reaching an asset that would otherwise have been available to general creditors had the bankruptcy case not been filed. The court ultimately concluded that the state statute conflicted with the Code and was invalid under the Supremacy Clause. In the matter before this Court, the exemptions at issue are not in conflict with the Bankruptcy Code. Whether one applies D&CL 282-283 or Code § 522(d), had New York not elected to opt out, the trustee would not have been able to reach Gloss's motor vehicle, for example, to the extent of $2,400 or $2,950, respectively. This is to be distinguished from the situation in *Kanter* where, but for the state statute at issue, the trustee would have been entitled to any monies recovered in the personal injury action.

The Court's conclusion is admittedly contrary to that of the court in *Wallace*, 347 B.R. 627. In that case, the court considered a Michigan statute which permitted debtors to claim bankruptcy-specific exemptions, including a homestead exemption of $30,000 - $45,000 of the equity in the property, depending on the age or disability of the Michigan resident at the time of filing of his/her bankruptcy petition.  Mich. Comp. Laws Ann. § 600.5451(1)(n).  Unlike New York residents, Michigan residents who filed bankruptcy had the option of choosing the state exemptions or those set forth in Code § 522(d)[7] because Michigan has not opted out of the federal exemptions.  *See generally, In re Vinson*, 337 B.R. 147, 150 (Bankr. E.D. Mich.), *rev'd sub nom. Vinson v. Dakmak*, 347 B.R. 620 (E.D. Mich. 2006).

The court in *Wallace* relied heavily on the analysis of the court in *Cross* in concluding that the state statute was unconstitutional.  It found Code § 522(b)(2) to be ambiguous and subject to two interpretations with respect to whether states were permitted to design their own bankruptcy-specific exemptions.  *See Wallace*, 347 B.R. at 630.  In addition, it relied on the analysis of the Court of Appeals for the Sixth Circuit[8] in *Hood*, 319 F.3d at 765 insofar as it found that Congress had the exclusive power to pass bankruptcy laws under the Bankruptcy/Uniformity Clause.  The court in *Wallace* acknowledged that "[t]he Sixth Circuit did recognize in *Hood* that *Sturges* represented a departure from the framer's original intent which was created out of the necessity

---

[7]  Code § 522(d), as noted previously, limits a debtor's exemption of the equity in his/her residence to $19,425.  11 U.S.C. § 522(d)(1) and (5).

[8]  The United States Bankruptcy Court for the Western District of Michigan, which rendered the decision in *Wallace*, is located in the Sixth Circuit.  Accordingly, it is bound by decisions rendered by the circuit where it sits, just as this Court is bound by decisions of the Court of Appeals for the Second Circuit.  *See In re Montgomery County Maryland v. Metromeida Fiber Network, Inc.,* 326 B.R. 483, 489 (S.D.N.Y.  2005)

of the times. *Wallace*, 347 B.R. at 633. It also recognized that "this understanding that the federal power was exclusive eventually gave way to an acceptance that states could, in the absence of federal legislation, pass laws on bankruptcy . . . . [and ] that *Sturges's* nonexclusivity interpretation was by 1833 firmly established by judicial decisions." *Id.* at 633-34. In further support of this view, the court in *Wallace* noted that "the Supreme Court in *International Shoe* confirmed *Hood's* interpretation of *Sturges* when it observed that '[s]tates may not pass or enforce laws to interfere with or complement the Bankruptcy Act. . . .'" *Id.* at 634, quoting *International Shoe Co. v. Pinkus*, 278 U.S. 261, 265 (1929). Ultimately, the court in *Wallace* concluded that the Michigan statute was unconstitutional because it allowed its residents who filed for bankruptcy relief to choose bankruptcy-specific exemptions, as an alternative to those exemptions available to them pursuant to Code § 522(d). According to the court in *Wallace,* Congress held the "exclusive power to establish what exemptions a debtor may claim in conjunction with a bankruptcy proceeding. . . . Therefore, Michigan's attempt to create its own set of bankruptcy-specific exemptions is constitutionally unenforceable." *Id.* at 635, citing *International Shoe*.

In analyzing the court's conclusions in *Wallace,* it is necessary to examine the Supreme Court's ruling in *International Shoe.* The case did not involve state exemptions. Instead, the court was asked to address whether what had occurred in chancery court was enforceable. Mr. Pinkus had previously been discharged in voluntary proceedings under the Bankruptcy Act of 1898 within six years prior to his filing a petition in the chancery court in Arkansas. *International Shoe*, 278 U.S. at 264. In chancery court, Pinkus agreed to turn over all of his property to a receiver for distribution to his creditors and to then obtain a discharge of any liabilities he might have to his creditors. Ultimately, the Supreme Court concluded that the Bankruptcy Act superseded the state

law, which it found "necessarily conflict[ed] with the national purpose to have uniform laws on the subject of bankruptcies throughout the United States." *Id.* at 268.  Accordingly, Pinkus was not eligible for a discharge of his liabilities and monies in the hands of the receiver were ordered to be turned over to the plaintiff, International Shoe Co., in payment of its judgment.

There is no question that the state law applied by the chancery court in *International Shoe* was unconstitutional.  As pointed out by the court in *Wallace*, the framers of the Constitution were well aware of the "hodgepodge of bankruptcy relief" that existed in the United States when it focused its efforts on a single national law of bankruptcy relief.  *Wallace*, 347 B.R. at 631.  For example, "a discharge granted to a debtor by a New Jersey court under New Jersey law would not guarantee the debtor from being imprisoned in Pennsylvania by a Pennsylvania court were he to later risk venturing into that state." *Id.*  The court in *Wallace* places great emphasis on the statement in *International Shoe* that "[s]tates may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations." *Id.* at 634.  However, it is important to put that statement into the context in which it was made.  Indeed, the prior statement reads" Congress did not intend to give insolvent debtors seeking discharge, or their creditors seeking to collect claims, choice between the relief provided by the Bankruptcy Act and that specified in state insolvency laws." *International Shoe*, 278 U.S. at 265.  However, in the matter presently under consideration, Congress did intend to give states the choice to opt-out of the federal exemptions and to offer their residents exemptions deemed relevant to those residents.  Indeed, the Supreme Court in *Stellwagen*, as noted previously, was clear in its view that Congress is well within its authority to recognize the laws of a state in "certain particulars," including exemption legislation.  *Stellwagen*, 245 U.S. at 613.

The critical consideration in determining whether state legislation is unconstitutional rests on the factors set forth by the Supreme Court in *Perez* some forty-two years after its decision in *International Shoe* concerning the existence of any conflict between the state and federal legislation.   It is also important to remember that Code § 522(b) represented a compromise whereby the states were given some flexibility to meet the needs and fresh-start requirements of their residents who elected to seek bankruptcy relief.   *See* S. Rep. No. 989, 95th Cong. 2d Sess. 6 (1977), *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787, 5792.   As noted by the Fifth Circuit Court of Appeals in *Davis v. Davis*, 170 F.3d 475 (5th Cir. 1999):

> [e]xemptions are fought over by states'-rights advocates, who value the traditional
> state legislative prerogative to adjust exemptions to local economic conditions, and
> by advocates of federal uniformity, who want to raise-or lower exemptions based
> on conceptions of national equity.   Congress allayed the controversy between state
> and federal advocates by providing in the 1978 Bankruptcy Code that states could
> opt out of prescribed federal exemptions altogether or could allow their citizens to
> select either schedule.

*Id.* at 478.   As Republican Senator Malcolm Wallop of Wyoming remarked on the compromise bill which included the opt-out provision, "we have won an important victory for the rights of States to determine exemptions for the debtors of the States."   (Senate Debate on Compromise Bill, 124 Cong. Rec. § 17406 (daily ed. Oct. 6, 1978).   Woodward too observed that

> it seems on balance more consistent with the Code as enacted that parity of
> creditors' rights in both systems has given way to the fresh start as the dominant
> federal policy in the exemption area.   It seems more consistent with that intent that
> a state be permitted under the supremacy clause to enact bankruptcy-only
> exemptions to further the fresh start policy even if the result will be a somewhat
> different distribution in bankruptcy than outside.   While there are probably limits,
> grounded in the bankruptcy policy of equitable distribution of assets, to a state's
> expansion of exemptions in bankruptcy, it seems highly unlikely that those limits,
> whatever they might be, will be approached by any state in the near future.

Woodward, 43 OHIO ST. L.J. at Footnote 181; *see also Davis*, 170 F.3d at 482 (indicating that the

28

states are free to "supplement bankruptcy law with respect to exemptions"); *Granger v. Watson*, 754 F.2d 1490, 1492 (9th Cir. 1985) (noting that an opt-out state "has considerable freedom in creating exemptions and eligibility requirements for those exemptions"); *In re Betz,* 273 B.R. 313, 323 (Bankr. D. Mass. 2002) (describing "state defined exemptions [as] merely the backdrop upon which 'federal principles operate to render results consistent with bankruptcy policy . . .'" (quoting *In re Leicht*, 222 B.R. 670, 680-81 (1st Cir. BAP 1998)).

New York, in enacting D&CL §§ 282-283, created certain exemptions specific to its residents who file bankruptcy. However, New York clearly has not expanded its exemptions, particularly those of a motor vehicle and cash, to a limit which would place those provisions in D&CL §§ 282-283 in conflict with those provided by Congress in Code § 522(d). In enacting the legislation, the Court believes that its approach was "commensurate with § 522(b)'s goals of balancing the state's interests in defining exemptions according to the needs and conditions of the locality, and the Code's fresh-start policy and uniformity." *Leicht,* 222 B.R. at 677. Accordingly, the Court will deny the Credit Union's objection to the cash exemption claimed by Brown pursuant to D&CL § 283 in the amount of $2,252 and to the motor vehicle exemption by Gloss pursuant to D&CL § 282(1) of $2,400.

**Homestead Exemption pursuant to CPLR § 5206**

_____There remains to be addressed the Credit Union's objection to Gloss's claim of a $50,000 exemption in his Residence pursuant to CPLR § 5206. The Court previously has addressed similar objections raised by creditors, including the Credit Union, in the cases of Aida L. Bronner, Case No. 05-68425 and Barbara and Corey Little, Case No. 05-68282, Anthony and Charlotte Little,

Case No. 05-69113, and Todd and Tammy Weber, Case No. 06-60457.[9]  Of relevance to the

matter presently under consideration, is the Court's Memorandum-Decision, Findings of Fact,

Conclusions of Law and Order, issued on September 21, 2006, in the Bronner case ("Bronner

Decision").

In the Bronner Decision, Wilber National Bank objected to the debtor's motion brought

pursuant to Code § 522(f), seeking to avoid its judgment lien, docketed in the Otsego County

Clerk's office on August 11, 2004.  The debtor claimed a homestead exemption of $50,000

pursuant to CPLR § 5206(a), as amended and made effective August 30, 2005.  In the Bronner

Decision the Court concluded that its analysis in the Barbara and Corey Little case (*In re Little*,

Case No. 05-68281, 2006 WL 1524594 (Bankr. N.D.N.Y. April 24, 2006)) was applicable to a

judgment creditor based on a finding that judgment recorded in the county clerk's office does not

create a vested right and the retroactive implementation of CPLR § 5206(a) did not violate the U.S.

Constitution's Contract Clause.  *See* Bronner Decision at 4-6.

In the matter presently under consideration, the Court finds no basis to alter its conclusion

in the Bronner Decision that retroactive application of CPLR § 5206(a) does not violate the

Contract Clause found at Article 1, Section 10 of the U.S. Constitution.  However, the Credit

Union also argues that its retroactive application also violates the Taking Clause of the Fifth

Amendment.  As this argument has not been previously addressed by the Court, it appears

appropriate to consider it now.

--------

[9]  The Court's rejection of the position taken by the Credit Union concerning the
retroactivity of the homestead exemption is on appeal in the *Anthony and Charlotte Little* case
and the *Todd and Tammy Weber* case to the United States District Court for the Northern District
of New York (D.J. Kahn).

Whether there is a violation of the Takings Clause requires the Court to weigh the public and private interests affected by the state regulation. *See Sadowsky v. City of New York*, 732 F.2d 312, 317 (2d Cir. 1984). Factors to be considered in connection with the retroactivity of a statute include "'the nature and strength of the public interest served by the statute, the extent to which the statute modifies or abrogates the asserted preenactment right, and the nature of the right which the statute alters.'" *In re Van Hove*, 78 B.R. 917, 921 (N.D. Iowa 1987). The court in *Van Hove* examined these factors, noting that a significant public purpose was served with the amendment of the exemption statute in that the legislature "merely attempted to create a new balance between debtors and creditors in light of economic reality." *Id.* The court also emphasized the fact that a taking "is less likely found when the challenged interference with property interests arises from the legislative adjustment of economic benefits and burdens for the promotion of the common good." *Id.* Finally, the court pointed out that at the time the creditors had made their loans to the debtors, they were aware of the lien avoidance provisions of Code § 522(f) and the possibility that exemptions were adjusted from time to time. *Id.* Thus, the court in *Van Hove* concluded that exemption statute, as amended, was not an unconstitutional taking of property interests. *Id.* at 922.

A similar conclusion was reached in *In re Betz*, 273 B.R. 313 (Bankr. D. Mass. 2002). There, the court was confronted with whether an increase in the state homestead exemption from $100,000 to $300,000 was to be applied retroactively to a judgment lien. The court considered whether the increased exemption constituted a taking of property under the Fifth Amendment of the Constitution. The court noted a division in the courts when addressing increases in homestead exemptions and whether they must be applied prospectively so as to avoid violating the Takings Clause. *Id.* at 325, n.15 (citing cases). The court noted that the creditor should have known at the

31

time that the lien arose that in the event that the debtor filed for bankruptcy, Code § 522(f) might impact on its lien and that state exemptions might be adjusted from time to time to reflect economic conditions.  *Id.* at 326; *see also Leicht,* 222 B.R. at 684.  Accordingly, the court concluded that the retroactive application of the increased homestead exemption did not infringe on the creditor's property rights under the Fifth Amendment.  *Id.* at 326-27.

This Court concurs with the conclusions in both *Van Hove* and *Betz* that the retroactive application of the New York homestead exemption available at CPLR § 5206(a) does not violate the Takings Clause of the U.S. Constitution.  The statute is one of public, as well as private interests, and reflects changing economic conditions, including the appreciation in value of real property that has occurred since the previous amendment of CPLR 5206(a) in 1977 when the exemption was increased from $2,000 to $10,000.  At the time that the Credit Union obtained its judgment against Gloss in April 2002, Code § 522(f) was in effect[10] and creditors such as the Credit Union should have been aware of the statute's impact on any judgment lien it might obtain in the context of a bankruptcy case.  Accordingly, the Court concludes that Gloss is entitled to claim a homestead exemption in the amount of $50,000 in seeking avoidance of the Credit Union's lien.

Because the value of the Residence, as well as the question of whether it consists of one or two parcels, appears to still be an issue (*see* letter of Crossmore, dated February 5, 2007 (Docket No. 32)), the Court will restore Gloss's motion seeking to avoid the lien of the Credit Union to the

---

[10]  Code § 522(f) became effective as part of the Bankruptcy Reform Act of 1978.

32

Court's chapter 13 calendar in Binghamton.[11]

Based on the foregoing, it is hereby

ORDERED that the Credit Union's objection to Brown's claim of a cash exemption pursuant to D&CL § 283 is denied; it is further

ORDERED that the Credit Union's objection to Gloss's claim of $2,400 exemption in his motor vehicle pursuant to D&CL § 282(1) is denied; it is further

ORDERED that the Credit Union's objection to Gloss's claim of a homestead exemption in the amount of $50,000 is denied; and is finally

ORDERED that Gloss's motion seeking to avoid the Credit Union's lien pursuant to Code § 522(f) be scheduled for further hearing on August, 2, 2007, at l0:00 A.M., in Binghamton, New York.


Dated at Utica, New York

this 23rd day of July 2007



/s/    Hon. Stephen D. Gerling
STEPHEN D. GERLING
Chief U.S. Bankruptcy Judge

---

[11]  The Gloss case was transferred to the Syracuse Division, the Hon. Margaret Cangilos-Ruiz presiding, on January 19, 2007.  This Court elected to retain jurisdiction over the case pending resolution of the instant motions.